**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**FIREARMS IMPORT/EXPORT ROUNDTABLE TRADE GROUP,**

**and**

**TIMOTHY BERO,**

                                    **Plaintiffs,**

      **v.**

**B. TODD JONES, Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, et al.,**

                              **Defendants.**

---

**Civil Action 11-547 (BJR)
MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

---

      Plaintiffs Firearms Import/Export Roundtable Trade Group ("FAIR") and Timothy Bero, the president of North West Imports (collectively, "plaintiffs")[1], bring this action against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("the ATF") and its director B. Todd Jones[2] as well as Attorney General Eric Holder and the Department of Justice (collectively, "defendants") alleging violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553

---

[1]      FAIR is a business organization that "provide[s] importers and exporters of firearms, firearm parts, firearm accessories, and ammunition with relevant and timely information regarding changes to federal, state and business dynamics" and that "work[s] to minimize risks for entities engaged in the trade."  Compl. ¶ 1.  North West Imports is "an importer and exporter of firearms and firearms accessories." *Id.* at ¶ 2.  Bero is a member of FAIR. *Id.*

[2]      On August 30, 2011, B. Todd Jones was appointed as the Acting Director of ATF, succeeding the previous Acting Director, Kenneth Melson, whom plaintiffs named as a defendant in their complaint.  Pursuant to Federal Rule of Civil Procedure 25(d), Jones has been substituted as a defendant in his official capacity.

*et seq.*, and the Fifth Amendment of the United States Constitution.[3]  Plaintiffs claim that the ATF improperly denied Bero's applications to import firearms barrels and that ATF's interpretation of the governing provisions of the Gun Control Act ("GCA" or "the Act") was unlawfully promulgated and is an arbitrary, capricious and erroneous interpretation of the statute. They also allege that the applicable GCA provision is unconstitutional.  Defendants move to dismiss plaintiffs' complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), or, in the alternative, for summary judgment.  Upon a review of defendants' motion, the opposition thereto, and the record of this case, the Court concludes defendants' motion should be granted.

## I.  BACKGROUND

### A.    Statutory Context

The GCA governs the importation of firearms.  Section 922(l) of the GCA makes it unlawful for any individual to "knowingly import or bring into the United States . . . any firearm or ammunition," except as provided for in 18 U.S.C. § 925(d).  18 U.S.C. § 922(l).  Section 925(d) provides that the Attorney General "shall authorize" the importation of a firearm if it falls within one of four exceptions to the general prohibition on firearm imports.[4]  The exception at

---

[3]        Plaintiffs purport to sue Jones and Holder in their individual capacities.  *See* Compl. ¶¶ 3, 6.  Defendants counter that government officials cannot be sued in their individual capacity where a complainant seeks only declaratory or injunctive relief.  Plaintiffs do not respond to this argument in their opposition.  In failing to defend this aspect of their complaint, plaintiffs have conceded defendants' point.  *See Cnty. Bd. of Arlington v. U.S. Dep't of Transp.*, 705 F. Supp. 2d 25, 29 (D.D.C. 2010) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (quoting *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002)).  Accordingly, the Court dismisses plaintiffs' individual-capacity claims against Jones and Holder.

[4]        The Attorney General, who has sole discretion to determine whether a firearm meets this sporting purpose test, has delegated this authority to the Director of the ATF.  *See* 28 C.F.R. § 0.130(a) (delegating to the Director of ATF the authority to "[i]nvestigate, administer,

issue in this case is for "sporting purpose" firearms.[5]  If a firearm is "generally recognized as

particularly suitable for or readily adaptable to sporting purposes," and if it is neither a firearm as

defined in section 5845(a) of the Internal Revenue Code,[6] nor a surplus military firearm, the

Attorney General must authorize it for importation.  18 U.S.C. § 925(d)(3).

In addition to creating four categories of importable firearms, section 925(d)(3) restricts

the importation of the component parts of non-importable firearms, including firearm barrels.  In

relevant part, it provides that "in any case where the Attorney General has not authorized the

importation of the firearms pursuant to this paragraph, it shall be unlawful to import any frame,

receiver, or barrel of such firearm which would be prohibited if assembled."  18 U.S.C. §

925(d)(3).  Congress added this provision to section 925(d)(3) in 1986 when it passed the

Firearms Owners' Protection Act ("FOPA").  In effect, the FOPA amendment prevents an

---

and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson, and perform
other duties as assigned by the Attorney General, including exercising the functions and powers
of the Attorney General" under the GCA including 18 U.S.C. § 922(l) (relating to the illegal
importation of firearms)); *see also Gun South, Inc. v. Brady*, 877 F.2d 858, 863 (11th Cir. 1989)
(noting that ATF "must decide whether a firearm is generally suitable for a sporting purpose");
*see also Springfield, Inc. v. Buckles*, 292 F.3d 813, 815 (D.C. Cir. 2002); *Demko v. United States*,
216 F.3d 1049, 1054 (Fed. Cir. 2000).

[5]      The other exceptions, which are not at issue in this case, include firearms that will
be used for scientific or research purposes, that are unserviceable, or that are a curio or museum
piece.  18 U.S.C. §§ 925(d)(1)–(3).

[6]      Section 5845(a) is a provision of the National Firearms Act ("NFA") that defines
a firearm to include sawed-off shotguns, short-barreled rifles, machineguns, silencers, destructive
devices, and certain concealable weapons.  *See* 28 U.S.C. § 5845(a).  Such an NFA "firearm" is
different from a GCA "firearm" which is defined in 18 U.S.C. § 921(a)(3) as "(A) any weapon
(including a starter gun) which will or is designed to or may readily be converted to expel a
projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any
firearm muffler or firearm silencer; or (D) any destructive device,"  18 U.S.C. § 921(a)(3), and
does not include antique firearms.  *Id.*

importer from circumventing the import restrictions on assembled firearms by disassembling a firearm into its component pieces for import and subsequent reassembly.

## B.    Regulatory Context

ATF has rulemaking authority with respect to federal firearms law.  *See* 18 U.S.C. § 926; 28 C.F.R. § 0.130(a)(1).  Pursuant to this power, the agency has altered its interpretation of the FOPA amendment in at least three instances.  Plaintiffs question the permissibility of these changes and the process that ATF followed to implement them.

In 1988, two years after the passage of the GCA, ATF published a final rule implementing section 925(d)(3)'s treatment of the import of non-sporting firearm barrels.  The agency drew a distinction between two classes of firearms that was not explicitly established in the statute: it interpreted section 925(d)(3)'s restriction on the import of non-sporting firearms parts to apply to parts for non-importable handguns but not to the parts of long guns.[7]  According to the defendants, this interpretation was "generally consistent with the fact that, as of 1988, ATF had applied the sporting purpose test to prohibit the importation of a long gun on only two occasions."[8]  Defs.' Mot. to Dismiss or, in the alt., for Summ. Judgment ("Defs.' Mot.") at 5–6.

---

[7]     Long guns are not defined in the GCA.  They are understood to include firearms such as muskets and rifles, *see Parker v. District of Columbia*, 478 F.3d 370, 398 (D.C. Cir. 2007), and they are distinct from handguns which the GCA defines as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled."  18 U.S.C. § 921(a)(29).

[8]     *See* Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles 4 (1989), available at http://www.atf.gov/firearms/ industry/july-1989-%20 importability-of-certain-semiautomatic-rifles.pdf.  The 1989 Study noted that two "combat-type" shotguns had been found to be non-sporting in 1984 and 1986.  *Id.* at 4–5.  Other than these two isolated instances, all long guns had been approved for importation so long as they were neither NFA firearms nor surplus military firearms.  *Id.* at 4.

In 2001, ATF narrowed the scope of permissible firearm part imports to include only those that were for "repair or replacement" of a long gun lawfully owned in the United States. *See* Administrative Record ("AR") at 5.  The agency provided notice of this new interpretation in its Federal Firearms Licensee Newsletter.  *Id.*  The prohibition on all handgun part imports remained in place.  The newsletter directed prospective importers to include in ATF Form 6 (the standard form though which importers apply for importation permits)[9] a representation that "the importation is for repair or replacement only."  *Id.*

In 2005, ATF eliminated the purpose-dependent, "repair or replacement" exception. After receiving input from the Office of Legal Counsel in the Department of Justice ("OLC")[10] on section 925(d)(3)'s meaning, ATF concluded that the repair or replacement exception did not conform to the governing statute.  Accordingly, on July 13, 2005, ATF issued an "Open Letter to Federally Licensed Firearms Importers and Registered Importers of U.S. Munitions Import List Articles" ("July Open Letter") announcing and explaining the change.  *See id.* at 24–26.  The letter stated that "ATF will longer approve ATF Form 6 application of any frames, receivers, or barrels for firearms that would be prohibited from importation if assembled."  It specified that

---

[9]      Title 27, Section 478.112(b)(1) of the Code of Federal Regulations provides that "[a]n application for a permit, ATF Form 6–Part I, to import or bring a firearm, firearm barrel, or ammunition into the United States . . . must be filed . . . with the [ATF] Director."

[10]      While considering proposal of additional regulations on imports ATF solicited the legal opinion of the OLC on the appropriate interpretation of section 925(d)(3).  AR at 16–17.  In a memorandum to the then-director of the ATF, OLC concluded that the statute did not provide a basis for the "repair or replacement" exception to the importation prohibition that ATF had read into section 925(d)(3) in 2001.  According to OLC, the exception was not supported by the text of the provision and was based on ATF's past "misapprehension of its authority."  *Id.* at 18–23. According to OLC's construal of section 925(d)(3), the provision erected a comprehensive ban on importing any frame, receiver, or barrel of any firearm that was itself non-importable.  *Id.* at 18–21.

"[n]o exceptions to the statutory language, for example for 'repair or replacement' of existing firearms, will be allowed." *Id*.[11]  Since issuance of the letter, ATF has denied applications to import certain parts if they are for a firearm which, when assembled, is not authorized for import.

**C.      Bero's Import Permit Applications**

In November 2010, Bero applied to ATF for two permits to import two different types of barrels:  900 "MG-34 Machine Gun Barrels" and 1000 "Scorpion Machine Pistol Barrels."  *Id.* at 27–28; 30–31.  The parties do not dispute that both were barrels of firearms that GCA prohibited from import in assembled form.  Bero indicated in ATF Form 6 that the "Specific Purpose of Importation" for both prospective barrel imports was "Resale."  *Id.* at 27, 30.  In no part of the application did Bero represent that the components he sought to import were intended for use as repair or replacement parts.  The ATF denied each of the two applications in two separate letters, which it sent to Bero in January 2011.  *Id*. at 29, 32.

**D.      Plaintiffs' Complaint**

Plaintiffs allege that the defendants have violated the APA and the Fifth Amendment. Plaintiffs' APA claims fall into two categories.  First, they contend that defendants violated section 553 of the APA when they failed to provide the public with notice and an opportunity to comment prior to the issuance of the July Open Letter.  Second, plaintiffs allege that defendants acted arbitrarily and capriciously and under an erroneous interpretation of the law in violation of

---

[11]      The ATF went on to acknowledge in the letter that the agency "recognizes that importers have, in the past, obtained import permit authorizing the important of barrels and receivers for non-importable firearms for "repair and replacement" and may have entered into contracts in reliance upon such authorization."  AR at 24–26.  Thus, as a mitigation measure ATF declared that it would forgo enforcement of the "import restriction" for 60 days and "allow importers holding existing permits to continue to import barrels and receivers" for 60 days.  *Id.* ATF further explained that it believed this amount of time would allow importers to complete the process of importing.  *Id.*

section 706 of the APA when they denied Bero's application to import barrels and when they promulgated the July Open Letter. *See* Compl. ¶¶ 45, 46.[12]  Plaintiffs assert that their inability to import repair parts as a result of this reinterpretation has harmed their businesses.[13]

Plaintiffs' constitutional claims appear to take three forms.  First, they allege that the GCA is "unconstitutionally vague and ambiguous for a statute with criminal implications." *Id*. ¶ 324.  As well, plaintiffs assert that the statute is unconstitutionally "overbroad." *Id*. ¶ 325.  Finally, they argue that defendants violated the Takings Clause of the Fifth Amendment when they eliminated plaintiffs' ability to import firearms barrels that were previously permitted.

As relief from defendants' allegedly unlawful conduct, plaintiffs ask the Court to declare that defendants violated the APA and the "rights of plaintiffs to the rule-making process" and that plaintiffs have the "legal right to import the barrels in question." *Id*. at 17.  Further, they request both a "temporary and permanent injunction," against defendants which would prohibit defendants from "denying Plaintiffs permits for the importation of the disputed barrels without first having complied with the [APA]." *Id*. at 19.  Finally, they ask the Court to "strike the portions of the GCA that are unconstitutionally vague" and that are being "mis-interpreted by the Defendants." *Id*. at 27.

---

[12]      Plaintiffs' articulation of this core claim is garbled at best.  Although the plaintiffs do not state as much, the Court construes their claim as a challenge to the ATF's adjudication under 5 U.S.C. § 706(2)(A).  Plaintiffs' cite ATF denials of Bero's two 2010 permit applications in support of their claim that the ATF's February 27, 2012 elimination of the repair and replacement exemption. *See* Compl. ¶ 214.

[13]      FAIR satisfies the requirements for associational standing because at least one member the association would have standing to sue in its own right; the interests they seek to protect are germane to FAIR's purpose; and neither the claim asserted nor the relief requested requires that an individual member participate in this suit. *Lake Carriers' Ass'n v. E.P.A.*, 652 F.3d 1, 5 n.3 (D.C. Cir. 2011) (citing *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)).

## II.  LEGAL STANDARDS

### A.      Standard of Review

In reviewing an administration action, the role of the district court is to "sit as an appellate tribunal" and review the case as a matter of law.  *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *accord Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  When an agency's findings are at issue, the question of law is "whether [the agency] acted in an arbitrary and capricious manner."  *Univ. Med. Ctr. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999).  Indeed, "[t]he entire case on review is a question of law, and only a question of law."  *Marshall Cnty.*, 988 F.2d at 1226.  When the constitutionality of an agency's action and not the rationality of its findings is challenged, a district court determines whether the agency based its decision on the appropriate constitutional standard.  5 U.S.C. § 706; *United Space Alliance v. Solis*, 2011 WL 5520428, at *4 (D.D.C. Nov. 14, 2011) (citing *Crowell v. Benson*, 285 U.S. 22, 60 (1932)).

### B.      Subject Matter Jurisdiction

Rule 12(b)(1) addresses a court's subject matter jurisdiction to adjudicate a case.  Courts have an affirmative obligation to ensure that they have subject matter jurisdiction over a case and are therefore acting within the scope of their authority in entertaining the claims before them. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. 2D § 1350). "The plaintiff bears the burden of establishing that the court has jurisdiction."  *White v. United States*, 791 F. Supp. 2d 156, 159 (D.D.C. 2011) (quoting *Grand Lodge*, 185 F. Supp. 2d at 13).

In deciding a Rule 12(b)(1) motion, a court need not limit itself to the allegations of the

8

complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds,* 482 U.S. 64 (1987).  Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [sic] whether it has jurisdiction in the case." *Scolaro v. D.C. Bd. of Elections and Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)); *see also Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

## C.     Failure to State a Claim

In contrast to Rule 12(b)(1), the Court's evaluation of a plaintiff's claims under Rule 12(b)(6) assumes all factual allegations contained in the complaint are true and gives the plaintiff the benefit of all favorable inferences that can be drawn from the facts alleged.  *See Equal Em't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 n.3 (D.C. Cir. 1997).  To survive a motion to dismiss, a complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  As well, it must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009) (quoting *Twombly*, 550 U.S. at 570).

## III.  ANALYSIS

## A.     The Court Declines to Consider Plaintiffs' Proposed Additions to the Administrative Record and Untimely Claims

Before considering the substance of plaintiffs' claims the Court must first delineate the administrative record and the claims that are properly before the Court.  In their opposition to defendants' motion and in two separate motions, plaintiffs have sought to supplement the

administrative record[14] with two additional documents: (1) an Open Letter sent on November 22, 2005 ("November Open Letter") from the ATF to firearm importers (the same audience as for the July Open Letter), which explains the requirements prospective importers must meet to import dual use barrels and (2) a letter from the ATF to Bero on October 3, 2011 regarding his inquiry about the assembly of two prototype semiautomatic firearms.  Defendants assert that the Court should not consider these submissions because they involve new allegations that were raised for the first time in plaintiffs' opposition.  *See* Defs.' Reply at 3–6.  Judge Amy B. Jackson granted plaintiffs' motions.  *See* Order of Oct. 17, 2011; Order of November 22, 2011.  Subsequently, upon leave of the Court, defendants filed an opposition to plaintiffs' two motions.  After reviewing defendants' opposition paper, which was not before Judge Jackson when she initially granted plaintiffs' motions, the Court concludes that it will not consider plaintiff's submissions in resolving plaintiffs' APA claims.

In this Circuit, courts grant motions to supplement the administrative record in a limited set of circumstances.  *See Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991); *Holy Land Foundation for Relief and Development v. Ashcroft*, 219 F. Supp. 2d 57, 65–66 (D.D.C. 2002).  These includes cases in which: (1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) the district court needed to supplement the record with "background information" in order to determine whether the agency considered all of the relevant factors, or (3) the agency failed to explain administrative action so as to frustrate judicial review.  *American Wildlands v. Kempthorne*, 530 F.3d 991, 1002

---

[14]     Plaintiffs mistakenly titled these two filings as "motions to cite additional authority."  The documents they attach do not constitute legal authority but rather purported evidence that they wish this Court to consider.  The Court therefore construes plaintiffs' submissions as motions to supplement the administrative record.

(D.C. Cir. 2008) (citing *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir.

1996).

Here, no such grounds for record supplementation exist. Plaintiffs have not demonstrated

— or even alleged — that either letter fits within any of the exceptions. More fundamentally,

neither document is relevant to plaintiffs' claims. Their complaint challenges the ATF's

elimination of the repair or replacement exception. Without amending their complaint, plaintiffs

cannot now challenge other ATF policies. "It is axiomatic that a complaint may not be amended

by the briefs in opposition to a motion to dismiss." *Arbitraje Casa de Cambio, S.A. de C.V. v.*

*U.S. Postal Service*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) (citations omitted); *accord Roberts*

*v. Napolitano*, 792 F. Supp. 2d 67, 73 n.3 (D.D.C. 2011). Thus, plaintiffs' new assertions about

the ATF's dual use barrel policy, as expressed in the November Open letter, and its policy on

assembly (not importation) of firearms, as applied in the October letter, are not properly before

the Court. Accordingly, the Court will not consider the letters or the untimely allegations that

plaintiffs advance in their motions to supplement the record. With the scope of the

administrative record established and the plaintiffs' allegations cabined to those contained in the

complaint, the Court turns to the substance of plaintiffs' claims and defendants' motion.

**B.      ATF Was Not Required To Undertake Notice and Comment Before Issuing the July
          Open Letter**

Plaintiffs argue that the July Open Letter was a legislative rule which, under the APA,

must undergo notice and comment. *See* 5 U.S.C. § 553. In light of this requirement, ATF

allegedly violated the APA when it failed to give notice and solicit public comment on its

proposed changes to section 925(d)(3) interpretations. Defendants counter that the change

articulated in the July Open Letter was an interpretative rule that is exempt from the notice and

comment requirement.  Defendants' arguments are well taken.

Under the APA, an agency is required to give notice of a proposed rulemaking and provide the public with an opportunity to comment on the proposed rule unless that rule is "interpretive."  5 U.S.C. § 553(b)(3)(A), (c).  "[W]ithout notice and comment" an agency may issue an interpretation that "changes a prior statutory interpretation."  *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997).  The question here, therefore, is whether or not the July Open Letter constitutes an interpretive (as opposed to a legislative) rule.[15]  Based on its reading of the letter, the GCA, and the applicable regulations, the Court concludes that it is interpretive and therefore exempt from the APA's section 553 notice and comment requirement.

In this Circuit, courts have drawn numerous lines between interpretive and legislative rules.  *See, e.g.*, *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579, 587–88 (D.C. Cir. 1997) (noting that "it is quite difficult to draw a line between substantive and interpretative rules" and citing *American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1108–09 (D.C. Cir. 1993)); *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1046 (D.C. Cir. 1987)).  The D.C. Circuit Court of Appeals has established that a rule is legislative "only if Congress has delegated legislative power to the agency and if the agency intended to use that power in promulgating the rule at issue."  *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Service*, 707 F.2d 548, 558 (D.C. Cir. 1983); *accord Syncor*, 127 F.3d at 95 (concluding that the "crucial distinction" appears to be that "a [legislative] rule modifies or adds to a legal norm based on the agency's own authority," and "[t]hat authority flows from congressional delegation to

---

[15]      Legislative rules are also referred to as "substantive" rules.  *See Cent. Tex. Tel. Co-op., Inc. v. F.C.C.*, 402 F.3d 205, 210 (D.C. Cir. 2005) (noting preference for the term "legislative rule").

promulgate [legislative] rules, to engage in supplementary lawmaking."). By contrast, an

interpretive rule is a "rule[] or statement[] issued by an agency to advise the public of the

agency's construction of the statutes and rules which it administers." *Am. Mining Cong. v. Mine*

*Safety & Health Admin.*, 995 F.2d at 1109 (D.C. Cir. 1993) (quoting ATTORNEY GENERAL'S

MANUAL ON THE ADMINISTRATIVE PROCEDURE ACT, 30 n.3 (1947)).[16]  In addition, a rule is

legislative if it "repudiates or is irreconcilable with" a prior legislative rule or if it amends a

legislative rule.  *Cent. Tex. Tel. Co-op., Inc.*, 402 F.3d at 211 (internal citations omitted).

In this case, the July Open Letter meets neither test.  In promulgating the letter, the ATF

did not invoke its power to enact legislative rules under 18 U.S.C. § 926.  Rather, it announced

the agency's new interpretation of what it may approve under the strictures of section 925(d)(3),

*see* AR at 24 ("ATF has determined that the language of 18 U.S.C. § 925(d)(3) permits no

exceptions that would allow frames, receivers, or barrels for otherwise non-importable firearms

to be imported into the United States.") and explained that, as a result of this revised

interpretation, the ATF "will no longer approve" import applications for prohibited frames,

receivers, or barrels.  *Id.*  Simply put, the agency conveyed that it would permit "[n]o exceptions"

to section 925(b)(3)'s prohibition.  *Id.*  Because the letter corrected a prior misapprehension of

---

[16]     Plaintiffs' argument that the ATF's July Open Letter was legislative because it
affected their rights is incorrect.  "[I]nterpretative and substantive rules may both vitally affect
private interests," and the "impact of agency action is not helpful in determining whether [the]
action is interpretative or substantive."  *Cabais v. Egger*, 690 F.2d 234, 237, 238 (D.C. Cir.
1982).  As the D.C. Circuit Court of Appeals found in a case in which the agency's room for
interpretation was broader than the ATF's in this case: "[t]he Department's interpretation of its
regulation, of course, has real consequences.  But that is always true when a Department or
agency selects an interpretation of an ambiguous statute or rule, and often we acknowledge a
government agency's right to do so as an 'interpretative' rule without notice and comment."
*Paralyzed Veterans* at 588 (citing *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1308 (D.C. Cir. 1991)).
Thus, plaintiffs' proposed test must be rejected.

the statute rather than new law promulgated pursuant to the agency's rulemaking authority, declines to find the July Open Letter legislative on this basis.[17]

Likewise, plaintiffs argument that the July Open Letter must be considered legislative because it amends 27 C.F.R. § 478.112 and conflicts with 18 U.S.C. § 922(r) and 27 C.F.R. § 478.39 is without merit. The letter is consistent with the three provisions. With respect to section 478.112, the letter modified no part of the regulation. That regulation provides that "[n]o firearm, firearm barrel, or ammunition shall be imported or brought into the United States by a licensed importer as defined in 27 C.F.R. § 478.11 unless the Director has authorized the importation of the firearm, firearm barrel, or ammunition." 27 C.F.R. § 478.112. Both the July Open Letter and this regulation allow an individual to import a handgun barrel so long as the handgun is importable under section 925(d)(3).[18] As well, the July Open Letter does not conflict with 18 U.S.C. § 922(r) and 27 C.F.R. § 478.39, which prohibit the *assembly* of non-sporting

---

[17]    Plaintiff cite *Hudson v. F.A.A.*, 192 F. 3d 992 (D.C. Cir. 1999) and *Paralyzed Veterans of America v. D.C. Arena L.P.,* 117 F.3d 579, 583 (D.C. Cir. 1997) to bolster their misguided contention that an agency must go through notice and comment if it changes its interpretation of a regulation that was enacted through that procedure. This line of argumentation is inapposite here. Those cases involved the agency's interpretation of its own regulation, rather than of a statute it was charged to administer. The D.C. Circuit Court of Appeals has noted that "[a]n interpretative rule . . . typically reflects an agency's construction of a *statute* that has been entrusted to the agency to administer." *Syncor*, 127 F.3d at 94 (emphasis added). This is precisely the scenario before the Court.

[18]    Plaintiffs' statement that section 478.112 "generally provide[s] for the importation of firearm barrels and only prohibit[s] the importation of certain types of handgun barrels " is false. Pls.' Opp'n at 16–17. To the contrary, the regulation establishes a blanket *prohibition* on importation, subject to ATF Director discretion. In so doing, it does not conflict with the GCA or the July Open Letter. Further, the subsection that plaintiffs cite — 27 C.F.R. § 478.112(b)(1)(vii)(F) — merely itemizes information that prospective importers must list in their permit application: "If [the application is for importation of] a firearm barrel for a handgun, [importers must include in the application] an explanation why the handgun is generally recognized as particularly suitable for or readily adaptable to sporting purposes." Under no plausible construal of this language does this provision *authorize* barrel importation.

semiautomatic rifles and shotguns from imported parts.  The Court agrees with defendants that section 478.39's grant of permission to use up to ten imported parts in assembling a non-sporting semiautomatic rifle or shotgun does not grant permission to import those parts.  Therefore, no inconsistency exists.  ATF was not required to undertake notice and comment before publishing the July Open Letter.  Accordingly, the Court dismisses plaintiffs' section 553 claim.

**C.     ATF' s Rejections of Bero's Applications and Interpretation of Section 925(d)(3) Are Not Arbitrary, Capricious or Erroneous as a Matter of Law**

Plaintiffs argue that ATF's denial of Bero's 2010 applications to import machinegun and machine pistol barrels was arbitrary and capricious because it was "opposite to the actions and stated interpretation taken by Defendants since 1968, when Congress passed the GCA."  Compl. ¶ 214.  They assert that "an entire industry relied upon the ATF's [prior] interpretation of Section 925(d)(3)" and that they have "effectively had the rug pulled out from under them" when the ATF changed this interpretation.  Pls.' Opp'n at 27.  Defendants counter that ATF's interpretation and application of section 925(d)(3) to Bero's permit application was both consistent and correct.  Defendants' argument prevails.

Agency action is arbitrary and capricious if the agency, in arriving at its decision, "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Air Transport Ass'n of Am., Inc. v. National Mediation Bd.*, 719 F. Supp. 2d at 30 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the

15

agency." *State Farm*, 463 U.S. at 43.  Agency action under review is "entitled to a presumption

of regularity" and courts must consider only whether the agency decision was based on relevant

factors and whether there has been a clear error of judgment.  *Citizens to Pres. Overton Park,*

*Inc. v. Volpe*, 401 U.S. 402, 415 (1971).  As discussed below, the ATF acted within the bounds

of these broad parameters when it eliminated the repair and replacement exception.

1.      **The ATF's Adjudication of Bero's Application Was Neither Arbitrary Nor Capricious**

Both of ATF's 2011 rejections of Bero's applications to import barrels were reasonable.

Indeed, the GCA compelled them.  The record demonstrates (and the parties do not dispute) that

Bero applied to import the barrels for "Resale" not for repair or replacement.  *See* AR at 27, 30.

Thus, even under ATF's pre-2005 interpretation of section 925(d)(3), the agency would have

denied his application.  Contrary to plaintiffs' arguments, defendants acted consistent with both

pre- and post-2005 ATF readings of the GCA.  Because the record reveals no inconsistency of

agency action with regard to Bero's application to import the barrels for resale, the Court finds

no arbitrary or capricious treatment of his application.  Accordingly, it dismisses this claim.

2.      **The July Open Letter is a Correct Interpretation of the GCA**

a.   **The Plain Text of Section 925(d)(3) Unambiguously Prohibits a Repair and Replacement Exception**

Plaintiffs argue that the GCA is ambiguous with respect to the repair or replacement

exception and that the ATF has interpreted section 925(d)(3) incorrectly.  They rely on the plain

language as well as the fact that the agency has changed its interpretation of it on several

occasions.  The defendants counter that section 925(d)(3) forecloses the repair or replacement

exception (thereby conceding that the ATF's prior interpretation was incorrect) and that the

frequency of interpretative modifications is of no moment because the agency has sufficiently

justified them.  The Court agrees with defendants.

In keeping with its role as an appellate tribunal reviewing agency action, *see Marshall Cnty. Health Care Auth.*, 988 F.2d at 1226, the Court applies the "familiar two-step framework" to the question of ATF's interpretation of the section 925(d)(3).  *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (citing *Chevron USA Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43 (1984)).  Under the *Chevron* rubric, courts must at "step one" "give effect to the unambiguously expressed intent of Congress."  *Id.*  If, instead, the "statute is silent or ambiguous with respect to the specific issue," then the Court continues to "step two" and defers to the administering agency's interpretation so long as it reflects "a permissible construction of the statute."  *Id.*  At *Chevron* step one, the Court examines the plain meaning of the text, "looking to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  *Blackman v. District of Columbia*, 456 F.3d 167, 176 (D.C. Cir. 2006) (internal quotation marks omitted).  If the statute has a plain and unambiguous meaning, the court's inquiry ends "so long as the resulting statutory scheme is coherent and consistent."  *Id.* (internal quotation marks omitted).  In short, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842–43.

Here, the Court concludes that the statute is clear: no "repair or replacement" exception can be read into the text.  The text is unambiguous.  In full, section 925(d)(3) provides that the Attorney General "shall authorize" a firearm for import if it is:

> of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1986 and is generally recognized as particularly suitable for or readily adaptable to sporting purposes, excluding surplus military firearms, except in any case where the Attorney General has not authorized the importation of the firearms pursuant

to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled.

Plaintiffs argue that ambiguity exists as to both the scope of the prohibition and the meaning of "of such firearm."  They are wrong.

To discern the text's plain meaning, the Court first turns to the scope of the FOPA amendment's treatment of component parts — i.e. the exception for "any case" where the Attorney General has not authorized the importation of firearms.  "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.'"  *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980)).  As well, "[i]n a series of cases, the Supreme Court has drawn upon the word 'any' to give the word it modifies an 'expansive meaning' when there is 'no reason to contravene the clause's obvious meaning.'"  *New York v. EPA*, 443 F.3d 880, 885 (D.C. Cir. 2006) (internal citations omitted).[19]

It is "usually understood to be all inclusive."  *Natural Res. Def. Council*, 489 F.3d at 1257 (citing

---

[19]    To be sure, in other circumstances, "any" can be given a less expansive meaning than usual. *See e.g.*, *Small v. United States*,544 U.S. 385, 388–94 (2005) (holding that the term "any court," as used in 18 U.S.C. § 922(g)(1), was limited to domestic courts because that Congress "ordinarily intends its statutes to have domestic, not extraterritorial, application," and because reading the statute to include foreign courts would create anomalies that Congress could not have intended); *Nixon v. Missouri Municipal League*, 541 U.S. 125, 133 (2004) (reading the term "any entity" in a federal preemption to exclude public entities, since a separate reading would lead to "strange and indeterminate results" that would have raised federalism concerns over a state's authority to regulate its own political inferiors).  None of these limited exceptions apply in this case.  There are no analogous background considerations, such as extraterritorial application or federalism that would compel a narrower reading of "any frame, receiver, or barrel."  18 U.S.C. § 925(d)(3).  In addition, as defendants notes, the interpretation plaintiffs promote would not, narrow the application of section 925(d)(3) to a subset of frames, receivers, or barrels that could have been defined in advance.  Instead, their interpretation could be applied to every imported frame, receiver, or barrel, depending on its intended use for repair or replacement.  As defendants rightly maintain, such a reading is untethered from the textual reference to "any frame, receiver, or barrel."

*Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 488 (D.C. Cir. 2007).

Applying this basic meaning to section 925(d)(3)'s text, the Court finds that the prohibition is expansive: "in *any* case where the Attorney General has not authorized importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled."  18 U.S.C. § 935(d)(3).  In effect, if the Attorney General has not authorized importation of a sporting purpose firearm, it is "unlawful to import any frame, receiver or barrel of such firearm which would be prohibited if assembled."  18 U.S.C. § 925(d)(3).  Congress did not — and the ATF may not — create an additional exception.  *See Natural Res. Def. Council v. EPA*, 489 F.3d 1250, 1259–60 (D.C. Cir. 2007) (concluding that EPA may not create an exception for air pollutant regulation when the statute does not provide for such an exception); *Indiana Michigan Power Co. v. Dept. of Energy*, 88 F. 3d 1272, 1276–77 (D.C. Cir. 1996) (finding Department of Energy may not "rewrite" a statute and vacating its decision). The statute's text provides no exception for repair or replacement components.

As a rejoinder, plaintiffs contend that the statute is ambiguous as to which types of firearm components are prohibited.  Specifically, they claim in their opposition brief that "barrel of such a firearm" is "speculative."  Pls.' Opp'n at 29.  The defendants dispute such ambiguity, arguing that the descriptor attached to "barrel of such a firearm" — i.e. "would be prohibited if assembled" — refers to firearms that the section would bar from import in assembled form.[20]

---

[20]     Plaintiffs also assert the fact that a barrel may be assembled into either an importable or a non-importable firearm, arguing that "it requires a total suspension of common sense to prohibit . . . the importation of items with lawful commercial value." Pls.' Opp'n at 30. This argument makes no sense. As defendants point out to the extent that plaintiffs argue that a barrel imported for assembly into an importable firearm is prohibited under ATF's interpretation of § 925(d)(3), they are mistaken.  Such a barrel would not be the 'barrel of [a NFA firearm, a non-sporting firearm, or a surplus military firearm] which would be prohibited if assembled,' and

The Court agrees with defendants.  As defendants assert, the preceding statutory language from which "barrel of such firearm" derives the limits of its meaning — a firearm that the Attorney General "has not authorized the importation of" —  resolves any ambiguity.  "[S]uch firearm" refers to a firearm whose importation the Attorney General has not authorized.  18 U.S.C. § 925(d)(3).  Further, the language following the phrase "barrel of such firearm" — i.e., "which would be prohibited if assembled" — does not list the kinds of barrels that are prohibited from importation.  Rather, it confirms that a firearm whose importation has not been authorized would be prohibited from importation if assembled.  In sum, although the statute is not the model of textual clarity, the Court does not find ambiguity with respect to the repair or replacement question.

In light of these findings, the Court cannot agree with plaintiffs that ATF is "left with the unfettered discretion to decide what is importable and what is prohibited."  Pls.' Opp'n at 30.[21]

---

there would thus be no prohibition against importing it. 18 U.S.C. § 925(d)(3)."  Defs.' Rep. at 14–15

[21]        Despite plaintiffs' urging, the Court finds examination of the FOPA's legislative history is unwarranted.  "While legislative history can be used to clarify congressional intent even when a statute is superficially unambiguous, the bar is high."  *Consumer Elecs. Ass'n*, 347 F.3d at 298 (D.C. Cir. 2003) (citing *Williams Cos. v. FERC*, No. 02-5056, slip. op. at 8 (D.C. Cir. Oct. 10, 2003)).  Only rarely do courts rely on legislative history to constrict the otherwise broad application of a statute indicated by its text.  *See, e.g.*, *Am. Scholastic TV Programming Found. v. FCC*, 46 F.3d 1173, 1180 (D.C. Cir. 1995).  Indeed, the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application.  *See New York v. FERC*, 535 U.S. 1, 21 (2002).  "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001) (internal citations omitted).  Plaintiffs have not shown otherwise here.  Moreover, their legislative history arguments are flawed in several respects (aside from entirely inaccurate citations to the Congressional Record).  First, they rely on statements made out of context.  For example, as defendants point out, plaintiffs have mischaracterized the context in which Sen. Kennedy made his statement. He was speaking about a provision in the FOPA to restrict the *interstate sale* of assembled handguns, and not about the importation of component parts.  Second, they point to letters from Senators that post-date the enactment of FOPA.  *See* Compl. ¶ 17.  Defendants are

To the contrary, the agency is bound by the broad statutory limitation on firearm component imports. Therefore, at *Chevron* step one, the Court concludes that the GCA is unambiguous in its command that ATF cannot grant importation exceptions for repair or replacement firearms parts.

### b. ATF Provided a Reasoned Explanation for Its Altered Interpretation of Section 925(d)(3)

Plaintiffs attack the frequency of the ATF's changes in interpretation of section 925(d)(3) and allege that the agency impermissibly failed to explain the basis for these changes, in violation of the APA. This argument is also unavailing. The ATF's changing interpretation of the GCA may well be a source of uncertainty and frustration for firearms part importers. However, the law is clear that "[a]n administrative agency is permitted to change its interpretation of a statute, especially where the prior interpretation is based on error, no matter how longstanding." *Chisholm v. FCC*, 538 F.2d 349, 364 (D.C. Cir. 1976) (citing *Automobile Club v. Commissioner of Internal Revenue*, 353 U.S. 180 (1957); *American Trucking v. AT&S F.R. Co.*, 387 U.S. 397, 416 (1967)); *see also Prod. Workers Union of Chicago and Vicinity, Local 707 v. N.L.R.B.*, 793 F.2d 323, 328 (D.C. Cir. 1986); *Phoenix Hydro Corp. v. F.E.R.C.*, 775 F.2d 1187, 1191 (D.C. Cir. 1985). Courts consider such flexibility "commonplace" within administrative law and require only that agencies provide "a reasoned explanation for its decision." *TRT Telecommunications Corp. v. F.C.C.*, 857 F.2d 1535 (D.C. Cir. 1988) citing *Chisholm*, 538 F.2d at 364. An agency "is not otherwise barred from switching horses in midstream." *Id.* Indeed, it

---

correct that, in this Circuit, legislative history from the period after enactment is considered "not only oxymoronic but inherently entitled to little weight." *Cobell v. Norton*, 428 F. 3d 1070, 1075 (D.C. Cir. 2005); *see also Gen. Instrument Corp. v. F.C.C.*, 213 F.3d 725, 733 (D.C. Cir. 2000). Thus, plaintiffs' legislative history arguments are unavailing.

is "at liberty to depart from its longstanding interpretation of a statute."[22]  *Id.*  In this Circuit, an

agency meets its obligation to provide a reasoned explanation when it 1) acknowledges its

change of interpretation and 2) provides an explanation of the reason for that change.  *Dillmon v.

Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089–90 (D.C. Cir. 2009).[23]

      As the record in this case shows, ATF met these requirements.  In no uncertain terms, the

agency eliminated the repair and replace exception after concluding that the GCA prohibited it.

In accordance with its APA obligations, the agency then notified the firearm importers of the

change in the July Open Letter and explained therein that the quoted statutory text "permits no

exceptions that would allow frames, receivers or barrels for otherwise non-importable firearms to

be imported into the United States."  AR at 24.  In so doing, ATF met its APA obligations to

provide plaintiffs with a reasoned explanation for the agency's elimination of the repair or

replacement exception.  As a result, because this claim and plaintiffs' other APA claims are

unavailing in all respects, the Court dismisses them.

---

[22]    Plaintiffs reliance on the Supreme Court's *stare decisis* rulings is unavailing.
They cite two cases for the proposition that "where the Governmental [sic] has for a lengthy
period of time interpreted the law in a way that induces reliance upon that interpretation, heavy
weight must be placed on the older interpretation." Pls.' Opp'n at 27 (citing *Dickerson v. United
States*, 530 U.S. 428 (2000) and *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)).
However, as defendants note, *Dickerson* and *Casey* say nothing about whether a federal agency is
permitted to adopt a changed interpretation of a statute it is charged to administer.  Rather, they
dealt with the Supreme Court's ability to overrule its own prior interpretations of the
Constitution.  The Court rejects this attempt to extend *stare decisis* principles to administrative
interpretations of federal statutes.

[23]    Plaintiffs cite cases from the Second Circuit that support this proposition.  *See*
Pls.' Opp'n at 24.  *Huntington Hosp. v. Thompson*, 319 F.3d 74, 79–80 (2d Cir. 2003) and *Mr.
Sprout, Inc. v. United States*, 8 F.3d 118, 129 (2d Cir. 1993), stand generally for the same
principle, as does the cited D.C. Circuit Court of Appeals case *Ramaprakash v. F.A.A.*, 346 F.3d
1121, 1124–25 (D.C. Cir. 2003).

**D.      Plaintiffs Lack Standing to Challenge the GCA on Vagueness Grounds**

Plaintiffs allege that the GCA violates their Fifth Amendment right to due process because it is impermissibly vague.[24]  Compl. ¶ 324.  They do not state that ATF has taken any enforcement action against them.  Instead, plaintiffs maintain that they face "possible criminal and civil penalties" for violating section 925(d)(3), *id.* ¶ 98, "possible criminal prosecution," Pls.' Opp'n at 34, and "penalties for using disputed barrels to assemble a legal firearm." *Id.* at 35.  As well, plaintiffs contend that the GCA "may be applied to them in ways that cannot be foreseen" and that they "cannot determine what is illegal and what is legal." *Id.*  Defendants counter that plaintiffs do not have constitutional standing to assert these claims because they have not been the subject of any  enforcement action.  Defendants are correct.

Article III of the Constitution limits this Court's jurisdiction of to "cases and controversies," and courts have interpreted this limitation to require adjudication of cases in which, among other requirements, plaintiffs plead that their claims spring from an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  In the preenforcement context, plaintiffs challenging a regulation before they have experienced its enforcement must, at the very least, plead: (1) a "credible statement of intent to commit the violative acts at issue," *Seegars v. Gonzales*, 396 F.3d 1248, 1253 (D.C. Cir. 2005), and (2) harm from a credible "threat of prosecution." *Navegar*, 103 F.3d at 998, 1000–01 (finding preenforcement standing for certain plaintiffs that the government singled out by name for a potential enforcement action and

---

[24]      Plaintiffs also allege that the GCA is unconstitutionally overbroad. *See* Compl. ¶ 325.  However, they did not respond to defendants' motion to dismiss this claim in any of their subsequent filings.  As noted above, *see supra* n.3, this failure to defend their pleadings amounts to a concession of defendants' arguments in support of dismissal. *See Hopkins* 284 F. Supp. 2d at 25; *Hoffman v. District of Columbia*, 681 F. Supp. 2d 86, 94 (D.D.C. 2010) (granting defendant's motion to dismiss a claim because plaintiff failed to respond to its arguments for dismissal).

finding no standing for the companies that challenged portions of a statute describing prohibited weapons only by general characteristics rather than by name).

In this case, plaintiffs fail to furnish either set of facts.  Bero does not assert that he intends to violate the law.  To the contrary, the record before the Court indicates that he has corresponded with the ATF on numerous occasions to ensure that his imports conform to the law. *See* Defs.' Supp. Mem. in Resp. to Pls.'. Mot to Cite Add. Auth., Exs. A, C.  The ATF has responded to his requests for clarification with at least partial answers to his inquiries and without asserting any threat of prosecution.  *See id.*, Exs. B, D, E, F.  As well, the 2011 ATF denials of Bero's applications do not rise to the level of prosecutorial threat.  Indeed, the record contains no evidence of even an intent to investigate plaintiffs, much less a plan to impose criminal or civil penalties for violations of the provisions at issue in this case.  In *Seegers*, the D.C. Circuit Court of Appeals found that no standing existed for gun manufacturers' vagueness challenge to a separate GCA provision even when plaintiffs had received various indications that enforcement was imminent, including visits of ATF enforcement officer to their facilities.  396 F.2d at 1248.  Here, without so much as a signal of intent to enforce on the part of the ATF, the record shows that plaintiffs' risk of prosecution is far lower.  Plaintiffs' some-day assertions that enforcement "may" occur, Pls.' Opp'n at 34, and that "possible" sanctions loom, Compl. ¶ 98, are insufficient.  Because plaintiffs have not plead an injury in fact with respect to the allegedly unlawful statute, they lack constitutional standing, and the Court must dismiss plaintiffs' vagueness claim for lack of subject matter jurisdiction.

**E.      Plaintiffs' Takings Claim Is Premature**

Plaintiffs assert that the ATF took their private property without justly compensation

them when they denied plaintiffs' ability to import the barrels.  This denial, according to

plaintiffs, removed "any viable economic or personal use of their property."  Compl. ¶ 433.

Although the meaning of plaintiffs' "property " is not clear on the face of the complaint,

plaintiffs' opposition brief explains that their takings claims is "predicated upon the weapons and

property owned and already, legally, imported into the United States," Pls.' Opp'n at 37, and that

"[t]hese weapons and weapons parts have been rendered valueless by Defendants' decision to

change their interpretation of the statute, and deny Plaintiff the ability to import parts for these

weapons."  *Id.*  Rather than damages, plaintiffs seek only injunctive and declaratory relief.  *See*

Compl. ¶¶ 29–32; Pls.' Opp'n at 36.  Defendants contend that any takings claim is premature

because plaintiffs have not sought compensation through the appropriate procedures.  Once

again, defendants have the better argument.

"Equitable relief is not available to enjoin an alleged taking of private property for a

public use, duly authorized by law, when a suit for compensation can be brought against the

sovereign subsequent to the taking."  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984)

(holding that the district court improperly issued an injunction when federal law provided a

monetary remedy for the taking); *cf. Turner Broadcasting v. F.C.C.*, 910 F. Supp. 734, 749

(D.D.C. 1995) (finding that declaratory and injunctive relief are "a remedy rarely available for

takings claims") (citing *Monsanto Co.*, 467 U.S. at 1016).  Indeed, a takings lawsuit is premature

if it is brought before plaintiffs have sought compensation in the form of damages.  *Presault v.*

*I.C.C.*, 494 U.S. 1, 11 (1990).  This limitation derives from the principle that "[t]he Fifth

Amendment does not proscribe the taking of property; it proscribes taking without just

compensation."  *Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*,

473 U.S. 172, 194 (1985) (citations omitted).  It follows that "so long as compensation is available for those whose property is in fact taken, the governmental action is not unconstitutional."  *U.S. v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 128 (1985) (citing *id.* at 194–195).[25]

Here, plaintiffs have failed to take the prerequisite step: filing of a suit for damages in the Federal Court of Claims (if they seek $10,000 or more in compensation) or in this Court (if the requested amount is anything less).  *See* 28 U.S.C. § 1491(a)(1); 28 U.S.C. § 1346(a)(2).[26]  Thus, plaintiffs' takings claim, which seeks only equitable relief, is premature.  As a result, the Court

---

[25]     Even if plaintiffs had asserted a takings claim for money damages in this Court or the Court of Federal Claims, it would not survive a motion to dismiss on the current record.  In *Lucas v. South Carolina Coastal Council*, the Supreme Court expressly recognized that personal property, "by reason of the State's traditionally high degree of control over commercial dealings," might be rendered "economically worthless" by new regulation without running afoul of the Takings Clause. 505 U.S. 1003, 1027–28 (1992).  The Court finds no evidence of such a rendering in this case.  Section 925(d)(3) does not regulate plaintiffs' ability to sell, trade, use, or otherwise exploit firearms they already possess.  Rather, it restricts the importation of firearm barrels that plaintiffs do not even own.  Plaintiffs may still use domestically manufactured firearm parts, including barrels, to repair the firearms that have allegedly been rendered valueless by the import prohibition.  Thus, their claim that they are entitled to compensation because their firearms have diminished in value as a result of the elimination of repair and replacement imports cannot stand. No taking has occurred.  *See Andrus v. Allard*, 444 U.S. 51, 66 (1979) (stating that "a reduction in the value of property is not necessarily equated with a taking" and concluding that a statute's prohibition against selling lawfully acquired birds did not effect a taking in violation of the Fifth Amendment because the bird owners still retained rights to posses, transport, donate and devise the animals); *see also Morris v. Runyon*, 870 F. Supp. 362, 371–73 (D.D.C. 1994) (rejecting takings claim when plaintiffs asserted diminished value in sheets of stamps they owned as a result of government printing more stamps).

[26]     The Tucker Act, 28 U.S.C. § 1491(a)(1), provides jurisdiction in the United States Claims Court for any claim against the Federal Government to recover damages founded on the Constitution, a statute, a regulation, or an express or implied-in-fact contract, and the Little Tucker Act creates concurrent jurisdiction in the district courts for such claims not exceeding $10,000 in amount.  28 U.S.C. § 1346(a)(2); *see also Presault,* 494 U.S. at 12; *Wisc. Valley Improvement v. FERC*, 236 F.3d 738, 743–44 (D.C. Cir. 2001) (finding the Court of Federal Claims has "exclusive jurisdiction" over takings claims)

grants defendants' motion to dismiss it for failure to state a claim upon which this Court can grant relief.

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that defendants' motion to dismiss must be granted.  Accordingly, on this 12th day of March, 2012, it is hereby

**ORDERED** that [Dkt. # 7] defendants' motion to dismiss plaintiffs' complaint is **GRANTED**.

An appropriate judgment accompanies this opinion.

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE